OSCAR JUNGNITSCH, BY HIS NEXT FRIEND, v. THE MICHIGAN MALLEABLE IRON COMPANY.

*Master and servant—Negligence—Injury to employé.*

1. Knowledge on the part of the foreman in the core room of an iron foundry, who is charged with the duty of directing employés where to go and assist the molders in filling the molds, that boys of the age and size of one so sent are competent to perform said work, and that said boy has performed it for six months to the satisfaction of all with whom he has worked, justifies the foreman in the assumption that he is dealing with a boy of the average size and strength, ordinarily competent to do the work, and who has shown himself competent, and in instructing said boy to do said work,

notwithstanding his statement, made in answer to such instruction, that he is not strong enough to do it.

2. The molder whom the boy was instructed to assist was perfectly familiar with his ability, had worked with him and beside him, and had seen him do work requiring as much strength as that in which he and the boy were about to engage. And it is held that, by accepting the service of the boy without objection, the molder estopped himself from claiming that the common employer is liable for a weakness on the part of the boy unknown to the foreman.

3. The reduction of danger to a minimum requires the exercise of the highest degree of care attainable, and the law imposes no such duty upon the employer, but only the exercise of that reasonable care which the ordinarily prudent and careful man exercises in like or similar work.

Error to Wayne. (Hosmer, J.) Argued January 22, 1895. Decided May 21, 1895.

Negligence case. Defendant brings error. Reversed, and no new trial ordered. The facts are stated in the opinion.

*Keena & Lightner (John Atkinson,* of counsel), for appellant.

*William Look* and *H. F. Chipman,* for plaintiff.

GRANT, J. The defendant is a corporation operating a foundry and engaged in the manufacture of iron. The molding room is large, and contains 72 floors, each of which is in charge of a molder, with a shifter under him. Plaintiff was about 18 years of age, and had been in the employ of the company for a year and a half. Most of that time he had worked in the trimming room and as shifter. About three weeks before the accident he was employed as a molder at his own and his father's request, his father being an old and experienced molder. Plaintiff was properly instructed in his duties, and had performed the service as well as beginners were accustomed to do. On the day in question he had prepared 38 molds for

filling, and had arranged them on his floor in 7 rows, of 5 each, and three extra ones back of those. Each mold was made of sand, inclosed in a box, and placed on a piece of board, with grooves in the sides for taking hold of and moving it. It was 12 by 14 inches, and 7 inches deep, and weighed 49 pounds. Each mold was covered with a piece of iron, with a hole in the center in the shape of a cross, into which the molton iron was poured by the molder. It was the duty of the molder to fill his ladle from the furnace with molten iron, and pour it into the molds. The ladle, when filled, weighed about 40 pounds, and contained enough to fill from 7 to 8 molds. It was the duty of the shifter to remove the pieces of iron from the tops of the molds as fast as they were filled, place them upon the molds in the next row, draw back the molds from 15 to 20 inches for the purpose of affording a passageway for the molder in filling the molds of the next row, and carry the molds after they were filled, and dump them in a pile a short distance away. The shifter stood with one foot on each side of the mold, and, stooping down, put his hands in the grooves, and pulled it back. Boys were usually employed as shifters, though men were employed for the heaviest molds. The ringing of a bell was the customary signal that everything was ready for casting, whereupon the boys in the trimming room left their work there, and went to the casting room to work as shifters. One George Long was foreman in the core room, and directed the shifters where to go. He had no other control over the molding room, and his entire duty, so far as this room was concerned, was to direct the shifters where to work. On this occasion, he directed a boy named Julius Horn to shift for the plaintiff. Horn had then been at work for the defendant six months in the trimming room, during which time he had been constantly employed as a shifter in the usual manner. It is alleged that Horn was incompetent to do this work, for the reason that he did not possess sufficient physical strength, and that defendant knew it,

and was therefore negligent in directing him to shift these molds for plaintiff. Horn's arm had been broken some years before, and was crooked. This, however, was not known to Long. Horn testified that when Long directed him to shift on this occasion for plaintiff he told him that he was not strong enough to do the work. This testimony was elicited from Horn on direct examination by the following leading and suggestive question:

"*Q.* Had you told anybody connected with the Michigan Malleable Iron Works that you were not strong enough to do that work?
"*A.* Yes, sir.
"*Q.* To whom had you told that you were not strong enough to do the work of moving those molds?
"*A.* George Long."

Horn was employed originally by one Young, the foreman of the trimming room. There was no pretense that he was not strong enough to do the work in the trimming room, or to do the work of a shifter, except for molds as heavy or heavier than those upon plaintiff's floor at the time of the accident. Plaintiff first filled the three extra molds. These were then moved back, and he commenced to fill the first row. The work proceeded satisfactorily, and all the molds were drawn back by Horn the proper distance, until the sixth row was reached. Plaintiff commenced at the right, and filled to the left, walking backwards, or "slantwise," as the witnesses expressed it. After filling one row, finishing at the left, he walked forward to the first mold at the right, through the space made by Horn in pulling back the preceding row just filled. He had thus filled all but the last row, and Horn had drawn back all the molds of the sixth row except the one at the left. The other four molds of this row just filled had been pulled back by Horn to a sufficient distance to permit plaintiff to pass between the fifth mold of the sixth row and the fourth mold of the same row, which had been pulled back, into the passageway, to go

again to the right. He passed through safely, and commenced filling the first one of the last row, and while he was attempting to fill this the accident occurred. His testimony upon this point is as follows:

"He [Horn] had all of them pulled back except one. He didn't have it far enough pulled back. I fell over this mold. I was just starting to pour, and I stepped back. I was too close to the mold. I could not get the ladle near enough to pour in, and stepped back with my right foot. I stepped on this mold, and it tipped, and I fell over. I cannot tell how far back I stepped.

"Q. Did you start to walk across over to fill No. 1 of the seventh row before Julius pulled it back, or did he pull the mold back before you started to walk back?

"A. It was pulled back before.

"Q. So that before you had moved to go back to No. 1 it was pulled out of your way?

"A. Yes, sir.

"Q. Do you remember that or do you only think that?

"A. I remember that they were.

"Q. Then how far back was it pulled?

"A. I could not tell you that.

"Q. You had room enough to walk through, did you not?

"A. I had room enough to walk between it, but not enough."

Neither plaintiff nor Horn was able to tell over which mold plaintiff stumbled. As he fell, the molten iron escaped from the ladle, sparks flew into the plaintiff's eyes, and put them out, in consequence of which he became permanently blind. It is alleged in the declaration that the molton iron came in contact with some pieces of cold iron lying near the floor, and that this contact caused an explosion. There was no evidence of negligence in leaving these pieces of iron where they were, and the court properly eliminated that ground of negligence from the case.

The court instructed the jury that there was no evidence in the case which would authorize them to infer that the work which Horn did while he was in the fac-

tory, up to the time of the morning of the accident, was, not performed in such a manner as to warrant the company in his retention. In this same connection he instructed them as follows:

"His fellow employés have testified certainly that he seemed to possess the average strength, and that he would carry an average load, at least, on a wheelbarrow, while in the trimming room,—the average load of those employed. There have been several of the molders testified that he had shifted for them, and that he performed his work well. And, as I said this morning, so far as his competency is concerned, I do not see how you or any one else could infer, from what evidence there is in this case, anything but that he was adequate to perform those duties, or but what the company had reasonable ground for believing he was adequate to perform those duties, which had theretofore been cast upon him; so that it comes down to the question in this case—any negligence of the company comes down to the question—of whether the company did its duty upon the morning of the accident. Now, gentlemen, you have heard the testimony in this case. On the one hand, you have heard the testimony of the plaintiff's witness Julius Horn, who testifies on that morning that he went to George Long when he was ordered to shift the molds for the plaintiff in this case, and told George Long (I have forgotten the exact language) that he was not strong enough to shift the molds or do that work. I cannot tell you exactly what the language was; you remember it. On the contrary, George Long comes into court, and denies positively that there was any such conversation as that. You may address yourselves to the question next to whether there was that conversation, because, gentlemen of the jury, if there was not that conversation, then, as requested by the defendant in this case, I charge you that there can be no liability on the part of the company, because they had every reason to believe, up to that time, at least, that he was able to perform that work to which he had been assigned. If, gentlemen of the jury, you find that he had that conversation, and you find that his arm was actually weak on that morning, and that he was unable to do that work, then it is a question for you to consider what George Long ought to have done under the circumstances. The counsel for the plaintiff claims, in that

respect, that there was this conversation, that his arm was weak, and that it was negligence on the part of the company then to send him to work. Whether it was negligence under those circumstances is a question for you, and not for me."

Plaintiff obtained verdict and judgment. Any further statement of facts necessary will be made in connection with the points determined.

1. Plaintiff and Horn were fellow-servants. His counsel say:

"The conduct of Horn in permitting plaintiff to walk into and fall over the mold was gross negligence. He saw plaintiff all the time."

We fully agree with this statement, if it be a fact that any one of the molds was in plaintiff's way, and Horn knew that he was in danger of stepping against it as he stepped backward. His testimony on this point is as follows:

"*Q.* Did you see that there was danger of Oscar falling over them? Did you see that they were in his way?

"*A.* Yes, sir.

"*Q.* And why didn't you speak to him?

"*A.* Because I was pulling the molds back. I could not speak to him.

"*Q.* Because you were pulling the molds back, but you were not pulling them back far enough?

"*A.* Yes, sir.

"*Q.* And you knew that you were endangering him, but you did not say anything to him?

"*A.* No, sir.

"*Q.* Why didn't you?

"*A.* Because I could not. I didn't have no time. I had to pull them molds quick enough back for him.

"*Q.* You did not tell him you were tired?

"*A.* No, sir."

The statement that Horn had no time to notify plaintiff that one or all of the sixth row were not moved back a sufficient distance, and to warn him of the danger, is too absurd to merit argument. This negligence of Horn was the negligence of a fellow-servant, for which the employer

is not liable, except upon the ground that it employed a servant knowing that he did not possess common intelligence, and no such claim is made.

2. The original declaration averred that Horn "had properly performed his duty and labor, and had removed all of said molds, with the exception of the last or left-hand mold in the sixth row, which mold he wholly failed to remove in consequence of his weakness, lack of physical strength and endurance, and becoming tired."

It was made apparent by the evidence upon the trial that the plaintiff did not fall and could not have fallen over the fifth mold, because he was in the act of pouring the first mold at the right when he fell, and Horn was at the same time in the act of pulling back the fifth mold, and each row was 8 feet four inches long. The court so found, and permitted plaintiff to amend his declaration so that it alleged that he fell over some one of the five molds in the sixth row. The amended declaration also alleged that Horn had properly performed his duty in removing all the molds up to the sixth row. For some reason, which I am unable to understand, plaintiff's counsel argued upon the hearing in this Court that plaintiff fell over the fifth mold. He argued that Horn had moved one end of the mold round so as to be in plaintiff's way. Horn testified—and this is the sole testimony upon the subject—that after plaintiff had passed from the left to the right, between mold No. 5 of the sixth row and No. 4 of the same row, and then between the seventh row and the other four molds of the sixth row, which Horn had pulled back, he (Horn) removed the weight to the seventh row, and was in the act of stooping down to pull back this fifth mold, when plaintiff fell. It is therefore conclusively established that plaintiff fell over one of the other four molds, but which one neither he nor Horn can tell. If he fell in consequence of coming in contact with a mold, it was undoubtedly one of the first three, and all questions must be determined under the

correct ruling of the court that the fifth mold had nothing to do with the accident.

3. Admitting that Mr. Long was the vice principal of the defendant, was the statement made to him by Horn sufficient to put him upon inquiry, and was it negligence to instruct him to do the work without making such inquiry? This question, which is the important one in the case, must be answered in the light of Horn's previous work, of Long's knowledge, what would have been disclosed by an investigation, and what that investigation should have been. It is not claimed that a boy 16 years old, and of average size, is not competent, and does not possess strength sufficient, to move molds of the size and weight of these. Such a claim would be absurd. Many such were employed for that purpose. Their employment is conceded to be proper. It is also conceded that young Horn was of the average size and apparent strength of boys of his age. He was paid the same wages and did the same work as all the others. There was nothing in his appearance to indicate any physical defect or weakness, nor had he ever made any complaint. So well had he done his work, as shown by the evidence, that the judge instructed the jury that there was no evidence from which any one could infer "anything but that he was adequate to perform those duties, or but what the company had reasonable ground for believing he was adequate to perform those duties, which had theretofore been cast upon him." If, therefore, any cause existed why he had not strength sufficient to move the molds, it was some hidden weakness or defect, unknown to Long, and the existence of which he had no reason to suspect. Horn did not inform him that his arm had been broken, or that it was weaker than it would be if it had not been broken, or that it was not then as well as usual. On the contrary, he testified that his arm was in its customary condition, and he was feeling as well and as strong as usual. Long, therefore,

assumed, and had the right to assume, that he was dealing with a boy of average size and strength,—one ordinarily competent to do the work, and who had shown himself competent by experience. To Long the statement meant no more than that Horn did not consider a shifter of average size and strength strong enough to move the molds. In fact, such a shifter is, as a rule, competent, and defendant cannot be held guilty of negligence for the exercise of the honest judgment of Long, though it turn out, by after experience, that he was not competent. Let us suppose that Long had stopped to examine Horn, and found that his arm had been broken. He would also have ascertained that it was broken when he was nine years old, that it was in the same condition that it had been during his term of service, and that he had moved much heavier weights than these. Six molders testified that Horn had moved molds heavier than these, and they gave the size and weight. Horn alone denies this, but cannot give the size and weight of the molds he moved. Two others also testified that they had seen him move molds as heavy as these. Had Long inquired of plaintiff, he would have ascertained that he had worked by the side of Horn for nearly six months in the trimming room and as shifter, and that he had moved molds as heavy as plaintiff had and as those he was then instructed to move; that he had heard no complaint, and had seen nothing to indicate any weakness. But suppose that Long had stood by to watch Horn for a while to see if he was able to do the work. He would have seen that he moved 32 molds properly, and that he had lifted, carried to, and thrown upon the dump pile the greater part of them,—a labor involving greater strength than pulling them back. If he had seen Horn do half the work properly and well, would he not have been justified in leaving him then to complete it? Experience had demonstrated to Long two things: (1) That boys of his age and size were competent; and (2) that Horn had done like work for six months before to the satisfaction of all with whom he

had worked. He was therefore justified in instructing Horn to do this work, notwithstanding his statement.

4. The risk was one plaintiff assumed. He was perfectly familiar with Horn's ability. As already shown, he had worked with him and beside him, and had seen him do work requiring as much strength as that in which they were both then engaged. He was under plaintiff's direction and control from the beginning of the work to its close. It was his duty to see that Horn did his work well. It was equally Horn's duty to inform plaintiff of any danger to him which he saw that plaintiff did not or could not, by exercising ordinary care, see. It was also his duty to inform him if he felt his strength failing so that he could not do the work properly. Plaintiff knew more about Horn's strength than did Long, having had better opportunity to observe it. He accepted his service without objection, and cannot now be heard to insist that defendant is liable for a weakness unknown to Long.

5. Was there evidence that the molds were not drawn back the proper distance? They were drawn back so far that plaintiff had no difficulty in passing between the four of the sixth row and those of the seventh, carrying his ladle. If there was room for him to pass one way in safety, it is difficult to understand why he could not as well pass the other way in safety. There was no fixed distance established or required. The distance varied according to the shifter and the room. Plaintiff on this point testified as follows:

"*Q.* Do you know how far the molds are drawn back wards after they are filled?

"*A.* No, sir.

"*Q.* How did you use to draw them when you were a shifter?

"*A.* Just as far as I pleased. I might pull them as far as I pleased. Nobody told me how far I had to pull them back.

"*Q.* So there is no particular distance then?

"*A.* No, sir; not that I know of.

"*Q.* Had you shifted for your father sometimes?

"*A.* Yes, sir.

"*Q.* Did he never tell you how far to pull the molds back?

"*A.* No."

Again he testified:

"In pulling the molds back it depends somewhat upon how much room you have. Sometimes you have got a lot of room, and sometimes you ain't. Sometimes you pull them further, and sometimes not so far."

It follows from this testimony that plaintiff had no right to rely upon any particular distance, much less upon the three feet alleged in the declaration to be necessary. Horn testified that he usually pulled them back about three feet. He also testified that he pulled the four of the sixth row back about a foot. In this he is clearly mistaken, because he had pulled the fourth mold back so that plaintiff walked between that and the fifth. Each mold was 14 inches long. Molds of the same size were placed upon the floor of the court room, arranged in the same manner as upon the floor of the foundry. Horn then moved them so that, as he testified, they were in the same relative position as at the time of the accident. The distance between the molds of the sixth and seventh rows, after he had moved the four of the sixth, was 19, 20, 20, and $21\frac{1}{2}$ inches, respectively. He testified that all four stood substantially on a line, but that some stood a little crooked. He also admitted finally that they were moved back at least 18 inches, and that he had told the attorney of plaintiff that he moved the sixth row back about 2 feet. It is therefore clearly established that the passageway between the rows was at least 18 inches. Horn does not pretend that there is any customary or fixed distance. He only pretends to state what he usually did, but when he says that he usually moved them 3 feet he is clearly mistaken, as is shown by his subsequent testimony. One Frexelius, a molder and a witness for plaintiff, illustrated with the molds the usual man-

ner of moving them, and by actual measurement he left a space of 19 inches. It is established by clear and positive evidence that the distance varies from 15 to 20 inches. The conclusion seems to me irresistible that Horn performed his full duty, and therefore the entire charge of negligence falls. If there was negligence anywhere, it was that of the plaintiff in stepping back too far, and in moving backwards instead of forwards while filling the molds. Other molders testified that in filling they moved forwards from left to right, or from right to left, as they are right or left handed, and that this was the proper way. Plaintiff gave no reason why he moved backwards.

6. It remains to notice one other error in the instruction of the court upon the care which it was the duty of the defendant to exercise in the employment of servants. As already shown, the court had in effect and correctly charged the jury that the defendant had exercised proper care in the original employment of Horn, and in his retention in the work of a shifter, and the only question was, had Long exercised proper care in placing him to act as shifter for plaintiff? In instructing the jury upon this point the court said:

"It is essential that the employer should use that care —that responsible care—in the selection of his servants that will, so far as possible, reduce the question of liability to accident to, we may say, in the ordinary course of affairs of life, a minimum."

No such rule governs in the ordinary affairs of life, and especially in a case where the work to be done requires only sufficient strength and a moderate degree of intelligence. The reduction of danger to a minimum requires the exercise of the highest degree of care attainable. The law imposes no such duty upon the employer, but only the exercise of that reasonable care which the ordinarily prudent and careful man exercises in like or similar work.

The judgment should be reversed, and, inasmuch as no

different case can be made upon a new trial, none should be ordered.

LONG and HOOKER, JJ., concurred with GRANT, J. MONTGOMERY, J., concurred in the result. McGRATH, C. J., did not sit.